**Gertrude DELP and Billy R. Delp, Appellants,**

v.

**Benjamin A. DOUGLAS; and Douglas, Kressler & Wuester, P.C., Appellees.**

No. 2–96–159–CV.

Court of Appeals of Texas, Fort Worth.

June 19, 1997.

Rehearing Overruled Aug. 7, 1997.

Gary F. DeShazo, Jon M. Smith, Jerome J. Schiefelbein, Gary F. DeShazo and Associates, Austin, for Appellants.

Charles T. Frazier, Jr., Dwayne J. Hermes, Gregory J. Lensing, Dallas, for Appellees.

Before LIVINGSTON, DAUPHINOT and RICHARDS, JJ.

## OPINION

RICHARDS, Justice.

This is an appeal from a dismissal of one plaintiff's claim and a directed verdict against the other plaintiff's claim in a legal malpractice case. We withdraw our prior opinion and judgment of April 24, 1997 and substitute the following in its place.

Appellees Benjamin Douglas and Douglas, Kressler and Wuester, P.C. (DKW),[1] represented appellants Billy and Gertrude Delp in a legal dispute with their business partner. Billy and Gertrude subsequently sued DKW for legal malpractice arising out of the representation in the business dispute. After fil-

---

1. For simplicity, we will refer to Douglas and DKW together as DKW.

ing the lawsuit, Billy filed for personal bankruptcy in federal court. Gertrude was not a party to Billy's bankruptcy. Philip R. Treacy & Associates (Treacy) bought Billy's claim in a trustee's sale. Although Billy objected, the trial court subsequently granted Treacy's motion to dismiss Billy's claim. Gertrude's claim proceeded to trial. But, after Gertrude rested her case, the trial court granted DKW's motion for directed verdict.

Billy and Gertrude argue that the trial court erred in dismissing Billy's claim and granting a directed verdict against Gertrude. Because we hold that Treacy did not have standing to dismiss Billy's claim, we will reverse as to him. Because we hold that the trial court erred in granting DKW's motion for directed verdict in some respects, but did not err in others, we reverse in part and affirm in part as to her.

## BACKGROUND

Because of the complicated nature of this lawsuit, we will review the facts in some detail. In 1956 or 1957, Billy and Gertrude formed the Nu–Way Oil Company with their partner John Harvison and his wife. The focus of Nu–Way Oil was to develop and operate self-service gas stations and convenience stores. As their business grew, Billy, Gertrude, and Harvison expanded their operation to include several other companies. First, they bought Economy Oil Company (Economy). Then, they formed Nu–Way Distributing, which trucked fuel to their convenience stores. They also formed Dynamic Industries Corporation (Dynamic) to develop new self-service stations in Mississippi. Eventually, they formed Nu–Way Energy and Nu–Way Exploration, which were involved in oil and gas exploration. Finally in the mid–1980s, they formed Nu–Way, Inc., which held the stock of Nu–Way Oil, Economy, Nu–Way Distributing, Dynamic, Nu–Way Energy, and Nu–Way Exploration.

Billy, Gertrude, and Harvison served as directors for all of the companies. Gertrude also served as secretary and treasurer. Billy and Gertrude asserted that Gertrude exercised her independent judgment in casting her director votes. Moreover, Billy stated that he never had authority to make decisions on Gertrude's behalf in important business matters.

In 1987, Harvison proposed that the companies go public. Initially, Gertrude adamantly opposed taking the companies public. Gertrude expressed her opposition to the move to Billy and to their son, who worked for the company. Eventually, Gertrude changed her mind and voted in favor of going public. The decision to go public required a unanimous vote. Therefore, the companies would not have been able to go public if Gertrude had not voted in favor of the move.

To go public, Billy, Gertrude, and Harvison first formed FFP Partners, L.P. (FFP Partners). Nu–Way Oil, Economy, Nu–Way Distributing, Dynamic, Nu–Way Energy, and Nu–Way Exploration contributed their assets to FFP Partners. In return, each of those businesses became Class B limited partners in FFP Partners. FFP Operating Partners, L.P. (FFP Operating) was a subsidiary of FFP Partners. FFP Operating managed FFP Partners. FFP Management Company, Inc. (FFP Management), was formed and became a general partner of both FFP Operating and FFP Partners. Billy was the chief executive officer of FFP Management. Billy, Harvison, and six others were the directors of FFP Management. Gertrude was not a director or officer of FFP Management.

Billy stated that as soon as the companies went public, Harvison began trying to buy business entities outside the core business activity of the companies. Billy was concerned that the new ventures would cause the partnership not to meet the expansion commitments made to investors during the initial public offering.

Billy eventually met with DKW attorneys Randy Kressler and appellee Benjamin Douglas to discuss whether he and Gertrude could take any legal action to stop Harvison from taking the partnership in risky new directions. DKW had represented Billy and Gertrude in several matters over the years. Kressler and Douglas advised Billy that, based on their review of the minutes, records, and bylaws of the company, Billy and Gertrude were legally entitled to modify the board because Nu–

Way and Economy, companies that they controlled, owned fifty percent of the voting rights of FFP Management. Billy testified that DKW did not advise him or Gertrude of the possible ramifications of taking the proposed action or of any possible response from Harvison.

After considering the attorneys' advice, Billy authorized Douglas to send a notice to FFP Management shareholders of a special shareholders' meeting to be held in April 1989. Billy wanted to make the board smaller and more independent of Harvison's influence. But, Billy still wanted both Harvison and himself to serve on the board.

Harvison reacted to the notice of the special shareholders' meeting by calling for a separate shareholders' meeting. At this meeting, the directors of FFP Management terminated Billy as chief executive officer. Harvison was removed as an officer at subsequent meetings of Nu–Way and Economy. In addition, Billy was given authority to vote all of Nu–Way's and Economy's stock in FFP Management. This gave Billy the power to control the outcome of FFP Management stockholder meetings.

Harvison responded by filing suit on behalf of himself, various members of his family, and various companies he controlled against Billy and Gertrude. Harvison's suit accused Billy and Gertrude of attempting to improperly obtain control of FFP, altering the minutes of Economy to add Gertrude as a director, breaching their fiduciary duties, and acting in bad faith. DKW represented Billy and Gertrude in Harvison's suit.

There was a temporary injunction hearing in which Gertrude was the primary witness. On the second day of the temporary injunction hearing, the two sides began settlement negotiations. Eventually, they reached an agreement in principle. Essentially, they agreed that Billy and Gertrude would receive physical store locations in exchange for giving up ownership and control of FFP companies and the other companies. The agreement was drafted by Harvison's lawyers as a compromise settlement agreement (CSA).

The CSA did not specify which physical store locations Billy and Gertrude would receive in exchange for their ownership and control of the companies. Instead, the CSA specified that the parties would "act with reasonable dispatch, in good faith, and in the most efficient manner reasonably possible" to divide the property. The CSA also required Gertrude to immediately resign her director positions in Economy and Nu–Way. This effectively deadlocked those companies because the only remaining directors were Harvison and Billy. The CSA also prevented any of the parties from suing each other for one year.

Billy and Gertrude met with Douglas for between thirty minutes and an hour. During this meeting, they reviewed the CSA and Douglas answered some of Billy and Gertrude's questions. After Douglas advised Billy and Gertrude to sign the CSA, they did so. Billy read the CSA before signing it and understood it "pretty good." Moreover, Billy testified that he voluntarily and willingly executed the CSA. Billy also said that although she was "reluctant," Gertrude voluntarily signed the CSA.

Shortly after the CSA was signed, Nu–Way experienced financial difficulty. Nu–Way had borrowed money from Sunbelt Savings (Sunbelt). Billy and Harvison had each personally guaranteed the debt. Because Nu–Way could not collect five million dollars owed to it by Harvison, his family, and his various businesses, as well as two million owed by Billy, Nu–Way could not keep up its payments to Sunbelt. Sunbelt eventually sued Nu–Way, Harvison, and Billy for payment of the loan. Sunbelt settled all of their claims against Harvison and his companies separately and then proceeded against Nu–Way and Billy. Sunbelt obtained a $1.2 million dollar judgment against Nu–Way and Billy individually. Because the board was deadlocked under the CSA, Billy was unable to force Nu–Way to liquidate its assets to pay the judgment. In his settlement with Sunbelt, Harvison bought its $1.2 million dollar judgment against Billy for $150,000. Harvison subsequently assigned that judgment to 7 HBF, a company owned by his children. Despite Billy's attempts to stop foreclosure, 7 HBF foreclosed on the debt secured by Nu–Way assets. In this manner,

Billy and Gertrude lost all of the assets they held through Nu–Way to Harvison and his children, who paid $150,000 for them.

As a result of the Sunbelt debt foreclosure and not being able to sell any assets because of the deadlock on the boards of the various companies, Billy filed for chapter 11 bankruptcy in November 1991. If Billy had not lost his assets through Nu–Way, he would not have had to file for bankruptcy. Documents from the United States Bankruptcy Court indicate that the debtor was "Billy Ray Delp, Jr." Gertrude is not listed in any of the documents as a party to Billy's bankruptcy proceedings.

Billy eventually filed suit against Harvison, his children, and the directors of FFP and Nu–Way to enforce the CSA. But, Harvison also bought this lawsuit in Billy's bankruptcy.

Billy & Gertrude sued DKW for legal malpractice regarding the CSA and DKW's failure to prepare Gertrude to testify at the temporary injunction hearing. At trial, an economist, Dr. George W. Berry, gave expert testimony that Billy and Gertrude suffered $9.1 million dollars in damages after the CSA was signed. Gertrude's damages were half of this; i.e., $4.55 million dollars.

Also, James Bruce Martindale, an attorney, gave expert testimony that the CSA failed to protect Billy and Gertrude's interests. Specifically, Martindale testified that DKW attorneys did not act as reasonably prudent lawyers because they failed to alert Billy and Gertrude of the possible consequences of calling a meeting to reconstitute the board of FFP. Martindale also testified that DKW was negligent in only spending two hours reviewing the CSA. Moreover, Martindale testified that the CSA was poorly drafted and failed to protect Billy and Gertrude's interests because it did not provide any means for them to enforce their rights absent filing a lawsuit. In particular, Martindale testified that the CSA was deficient from Billy and Gertrude's point of view because it did not specify which properties they would receive and the "with reasonable dispatch ... in the most efficient manner rea-

sonably possible" language was so vague and ambiguous as to be unenforceable. As such, Billy and Gertrude "gave away the store" in that they lost all of their leverage in the situation. Additionally, Martindale testified that one thirty minute oral conversation was insufficient to properly explain the CSA to Billy and Gertrude. Instead, Martindale testified, DKW should have reduced their assessment of the CSA to writing and then orally explained that assessment. Martindale also testified that a reasonably prudent attorney would have spent more time preparing Gertrude to testify at the temporary injunction hearing.

## PROCEDURAL HISTORY

Billy and Gertrude filed this lawsuit alleging legal malpractice against DKW on May 3, 1991. Billy filed for bankruptcy in November 1991. Billy listed his interest in the lawsuit as an asset of his bankruptcy estate. The plan of reorganization that was confirmed by the bankruptcy court and affirmed by the federal district court provided for the creation of a liquidating trust that would hold all of Billy's nonexempt assets and then sell them. On February 7, 1994, the Liquidating Trustee held a "sealed bid" sale where Billy's malpractice claim was sold to Treacy for $25,600. In response to a request for production from Billy and Gertrude's attorneys, DKW produced a letter from its attorney Robert C. Wendland[2] to Phillip Treacy indicating that Treacy was "acting on behalf of the Home Insurance Company" in buying Billy's claim. Moreover, Treacy was to buy Billy's claim so that they could "take appropriate steps to dismiss Mr. Delp's claims against the Defendants." In response to Billy and Gertrude's Interrogatory Number 8, DKW indicated that "Home Insurance Company of Indiana" was its malpractice insurance carrier.

Before the trustee's sale, the Liquidating Trustee issued a memo to all prospective buyers describing the trust assets to be sold. In this memo, the Liquidating Trustee indi-

---

**2.** At the time Wendland sent this letter to Treacy, he was attorney of record for DKW. He subse-

quently withdrew.

cated with regard to Billy's claim in this lawsuit that "Gertrude Delp is a co-plaintiff and is not part of Billy Delp's bankruptcy estate."

On April 11, 1994, Treacy, acting as "successor in interest to the claims of Billy R. Delp, Jr.," filed an agreed motion to dismiss. On April 13, 1994, the trial court signed an agreed dismissal order. On May 10, 1994, the court set aside its dismissal order so that Billy could contest the dismissal in written motions. On December 22, 1994, after considering Billy's "Motion to Set Aside Dismissal and, In The Alternative, Motion For New Trial" and his "Amended Motion to Retain Case and Opposing Dismissal" as well as the responses from Treacy and DKW, the trial court entered an order dismissing Billy's claim.

Gertrude proceeded to trial with her claim on January 22, 1996. Gertrude's last live pleading asserted causes of action against DKW for negligence, negligence *per se*, DTPA violations, and breach of fiduciary duty. Gertrude asked for both actual and exemplary damages. Gertrude, Billy, Martindale, and Berry testified.

After Gertrude rested her case, DKW filed a motion and supplemental motion for directed verdict. After a hearing, the court granted the motions and entered a take-nothing judgment in favor of DKW. Billy and Gertrude filed a timely motion for new trial on March 15, 1996. The court overruled their motion for new trial by written order on April 22, 1996. Billy and Gertrude timely perfected appeal to this court.

## I. BILLY'S CLAIMS

In their second point of error, Billy and Gertrude claim the trial court erred in granting the agreed motion to dismiss Billy's claims. Billy and Gertrude argue that Treacy did not have standing to dismiss Billy's claims because in Texas, a plaintiff must be in privity with the defendant lawyer to prosecute a legal malpractice action and because legal malpractice actions may not be assigned. DKW responds that Billy's claims became part of his bankruptcy estate and were assignable by the trustee in bankruptcy. As such, DKW argues, the court properly dismissed Billy's claims on Treacy's motion.

### A) WHAT INTEREST DID THE BANKRUPTCY TRUSTEE HAVE IN BILLY'S CLAIMS?

#### 1) *The Texas Policy Against Assigning Legal Malpractice Claims*

As a matter of Texas law, as DKW concedes, Billy did not have the right to assign his malpractice claims because in Texas, legal malpractice claims are nonassignable. *City of Garland v. Booth*, 895 S.W.2d 766, 769–71 (Tex.App.—Dallas 1995, writ denied); *Zuniga v. Groce, Locke & Hebdon*, 878 S.W.2d 313, 318 (Tex.App.—San Antonio 1994, writ ref'd). The reasons for this prohibition are grounded in public policy. As one court has noted:

> The commercial aspect of assignability of choses in action arising out of legal malpractice is rife with probabilities that could only debase the legal profession. The almost certain end result of merchandising such causes of action is the lucrative business of factoring malpractice claims which would encourage unjustified lawsuits against members of the legal profession, generate an increase in legal malpractice litigation, promote champerty and force attorneys to defend themselves against strangers. The endless complications and litigious intricacies arising out of such commercial activities would place an undue burden on not only the legal profession but the already overburdened judicial system, restrict the availability of competent legal services, embarrass the attorney-client relationship and imperil the sanctity of the highly confidential and fiduciary relationship existing between attorney and client.

*Goodley v. Wank & Wank, Inc.*, 62 Cal. App.3d 389, 133 Cal.Rptr. 83, 87 (1976). As such, assignability of malpractice claims "would only debase the legal profession." *In re J.E. Marion, Inc.*, 199 B.R. 635, 638 (Bankr.S.D.Tex.1996); *see also Booth*, 895 S.W.2d at 771 (Assignment would "debase the legal system and imperil the attorney-client relationship."); *Zuniga*, 878 S.W.2d at 318 ("On balance, we conclude that the costs to the legal system of assignment outweigh its benefits.").

■ While prohibiting assignment of legal malpractice claims benefits attorneys as stated in these cases, we believe there is also a compatible policy of protecting the public from legal malpractice that supports nonassignability. The people of Texas have an interest in assuring that attorneys who commit malpractice may be held accountable for their actions. We recognize that more than economic recovery for the plaintiff's injuries is at stake in a legal malpractice action: legal malpractice actions are an important check on the bar in that they are an external means of policing attorney behavior.

Here, the allegedly negligent attorneys, through their malpractice carrier, were able to purchase and dismiss Billy's claims before they ever came to trial. In this manner, without the consent of the allegedly wronged party, they were able to exonerate themselves without having to explain or justify their actions. As such, this is a particularly onerous effect of allowing the assignment of a legal malpractice action to the highest bidder. We do not believe the public's interest in ensuring that attorneys, the guardians of our judicial system, carry out their duties in a competent and professional manner is served by this disposition of Billy's claim.

### 2) Were The Claims Part of Billy's Bankruptcy Estate?

■ Section 541 of the Bankruptcy Code provides:

(a) The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:

(1) Except as provided in subsections (b) and (c)(2) of this section, *all legal or equitable interests of the debtor in property as of the commencement of the case.*

. . . .

(c)(1) . . . [A]n interest of the debtor in property becomes property of the estate under subsection (a)(1) . . . of this section *notwithstanding any provision in . . . applicable nonbankruptcy law—*

(A) *that restricts or conditions transfer of such interest by the debtor;*

. . . .

11 U.S.C.A. § 541 (West 1993) (emphasis added). State public policy restrictions on assignability of legal malpractice claims are "precisely the sort of non-bankruptcy restriction on transfer which Congress invalidated" with section 541(c)(1)(A). *In re Ellwanger,* 140 B.R. 891, 900 (Bankr.W.D.Wash.1992); *see also Integrated Solutions, Inc. v. Service Support Specialties, Inc.,* 193 B.R. 722, 728 (D.N.J.1996) (holding that state restriction on transfer of tort claims does not preclude assignment of a debtor's tort cause of action to his bankruptcy estate). Thus, we agree with DKW that Billy's legal malpractice claims became part of his bankruptcy estate.

### 3) What is the Nature of the Interest that Became Part of the Estate?

While we agree with DKW that Billy's claims were part of his bankruptcy estate, that does not end our analysis. We must examine the nature of the interest the trustee acquired to determine whether the transfer to Treacy gave him standing to dismiss Billy's claims.

■ Although Billy's interest in his malpractice claims became part of his bankruptcy estate under section 541, the Trustee did not acquire a greater interest in the claims than that which Billy had. It is a fundamental bankruptcy principle that the estate succeeds only to the same title and rights in property that the debtor possessed. *Integrated Solutions,* 193 B.R. at 729. Thus, the trustee does not have greater rights than the debtor had before bankruptcy.

■ The nature and extent of the debtor's rights in property, and therefore of the estate's rights in the same property, are defined by nonbankruptcy law, generally state law. *Integrated Solutions,* 193 B.R. at 729; *see also Butner v. United States,* 440 U.S. 48, 54, 99 S.Ct. 914, 917, 59 L.Ed.2d 136, 141 (1979); *In re Haber Oil Co., Inc.,* 12 F.3d 426, 435 (5th Cir.1994).

Moreover, while the Bankruptcy Code specifically includes property in the bankruptcy estate regardless of state law restrictions on assignment, it does not mandate that the trustee sell nonassignable assets. Section

363 of the Bankruptcy Code authorizes the trustee to "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C.A. § 363(b)(1) (West 1993). Further, the trustee shall "collect and reduce to money the property of the estate for which such trustee serves, and close such estate as expeditiously as is compatible with the best interests of parties in interest."[3] 11 U.S.C.A. § 704(1) (West 1993). Neither of these provisions authorizes the trustee to sell property contrary to state law transfer restrictions. *Integrated Solutions,* 193 B.R. at 728. As such, "[sections] 363(b)(1) and 704 are 'simply enabling statutes that give the trustee the authority to sell or dispose of property if the debtors would have had the same right under state law.'" *Integrated Solutions,* 193 B.R. at 729 (quoting *In re Schauer,* 835 F.2d 1222, 1225 (8th Cir.1987)); *see also In re FCX, Inc.,* 853 F.2d 1149, 1155 (4th Cir.1988), *cert. denied,* 489 U.S. 1011, 109 S.Ct. 1118, 103 L.Ed.2d 181 (1989) (Sections 363(b)(1) and 704 "evince no intent to enlarge the trustee's rights to take such actions beyond the debtor's pre-bankruptcy rights.").

■ In conclusion, although Billy's interest in his malpractice claims did pass to his bankruptcy estate, that interest was a nonassignable interest and the Bankruptcy Code did not authorize the trustee to sell that nonassignable interest to Treacy.[4] *See J.E. Marion,* 199 B.R. at 639 (holding that while legal malpractice claims are property of the bankruptcy estate, they are nonassignable).

### B) Did Treacy Have Standing to Dismiss Billy's Claims?

■ Having found that the bankruptcy estate succeeded to a nonassignable interest in Billy's legal malpractice claims, we must now determine whether the trustee's sale of the interest was sufficient to confer standing on Treacy to dismiss Billy's claims. We hold, that as a matter of Texas law, Treacy did not have standing to dismiss Billy's claims.

Treacy was not in privity with DKW with regard to DKW's representation of Billy and Gertrude. Therefore, Treacy would not have standing to prosecute a claim for legal malpractice against DKW on behalf of Billy and Gertrude. *Barcelo v. Elliott,* 923 S.W.2d 575, 577–79 (Tex.1996); *Bryan & Amidei v. Law,* 435 S.W.2d 587, 593 (Tex.Civ.App.—Fort Worth 1968, no writ). This coupled with the lack of federal authority allowing the trustee to sell Billy's claims to Treacy convince us that Treacy did not have standing to dismiss Billy's claims.

This case is analogous to *Integrated Solutions.* In *Integrated Solutions,* the trustee in bankruptcy sold the debtor's tort claims to Integrated Solutions, Inc. (ISI) despite the fact that it is well settled that New Jersey law and public policy prohibit prejudgment assignment of business and personal injury tort claims. *Integrated Solutions,* 193 B.R. at 726. ISI filed suit in an attempt to prosecute the debtor's claims. The trial court granted the defendant's motion for partial summary judgment on the grounds that ISI did not have standing to prosecute the debtor's claims. The court first held that the tort claim became part of the debtor's bankruptcy estate under section 541. *Id.* at 727–28. But, the court also held that neither section 704 nor section 363(b)(1) authorized the trustee to sell the tort claim contrary to the state law transfer restrictions. *Id.* at 728–29. Based on this, the court granted the defendant's motion for summary judgment because ISI lacked standing, as a matter of New Jersey law, to pursue the debtor's claims. *Id.* at 729–30.

The *Ellwanger* decision, so heavily relied on by DKW, is inapposite. First, *Ellwanger* dealt with a "Motion and Declaration to Determine Ownership [of] Action, to Disallow Claim and to Vacate Fee Award and for Sanctions." *Ellwanger,* 140 B.R. at 895. As

---

**3.** We find it hard to imagine a situation in which the sale of a legal malpractice claim to the defendant attorney's malpractice carrier is "compatible with the best interests of the parties in interest."

**4.** As we discuss in note 5 below, we do not purport to void the sale of Billy's claims to Treacy. But, we do look at the bankruptcy court's authority to sell Billy's claims as it relates to Treacy's standing to dismiss those claims in a state court proceeding.

such, the only issue presented to the court was whether the legal malpractice claims at issue were part of the debtor's bankruptcy estate under section 541. The court never reached the dispositive issue in this case of whether sections 704 and 363(b)(1) permit the trustee to sell an asset that is nonassignable as a matter of state law.

Additionally, we note that the *Ellwanger* court also pointed out that the policy reasons supporting nonassignability were not applicable to the issue of whether the legal malpractice claims became part of the bankruptcy estate. The reason for this was that:

> [Debtors] have fiduciary duties to the estate, and a transfer by operation of law to an entity which is in essence their *alter ego* is not the equivalent of auctioning off such claims to strangers or factoring them, nor does it encourage unjustified suits or force attorneys to defend themselves against casual purchasers of causes of action.

*Id.* at 901. In this case, the transfer was not to Billy's *alter ego*, but rather to a party that was acting on behalf of the defendant law firm's malpractice carrier. We would not allow a random party with an axe to grind to purchase Billy's claim so that the party could prosecute it against DKW. Nor shall we allow DKW, acting through an agent, to purchase Billy's claim and then dismiss it.

We believe that this resolution will best serve both state and federal interests. *See In re Roach*, 824 F.2d 1370, 1374 (3d Cir. 1987) ("[T]he Bankruptcy Code was written with the expectation that it would be applied in the context of state law and ... federal courts are not licensed to disregard interests created by state law when that course is not clearly required to effectuate federal interests."). Because we hold that the trial court erred in dismissing Billy's case because Treacy did not have standing to move the court to

dismiss, we sustain Billy and Gertrude's second point of error.[5]

## II. GERTRUDE'S CLAIMS

In their first point of error, Billy and Gertrude claim the trial court erred in granting DKW's motion for directed verdict as to Gertrude's claims.

### A) THE STANDARD OF REVIEW

■ A directed verdict is proper only under limited circumstances. These include: (1) a specified defect in the opponent's pleading makes it insufficient to support a judgment; (2) the evidence conclusively establishes the right of the movant to judgment or negates the right of the opponent; and (3) the evidence is insufficient to raise a fact issue that must be established before the opponent is entitled to judgment. *Boswell v. Farm & Home Sav. Ass'n*, 894 S.W.2d 761, 768 (Tex.App.—Fort Worth 1994, writ denied); *Rowland v. City of Corpus Christi*, 620 S.W.2d 930, 932–33 (Tex.Civ.App.—Corpus Christi 1981, writ ref'd n.r.e.); *see also* TEX.R. CIV. P. 268.

In reviewing the directed verdict in this case, we must view the evidence in the light most favorable to Gertrude and disregard all contrary evidence and inferences. *Porterfield v. Brinegar*, 719 S.W.2d 558, 559 (Tex. 1986); *White v. Southwestern Bell Tel. Co.*, 651 S.W.2d 260, 262 (Tex.1983). We must determine if there is any conflicting evidence of probative value that raises a material fact issue. *White*, 651 S.W.2d at 262. If there is any such evidence on any theory of recovery, a determination of that issue is for the jury. *Szczepanik v. First Southern Trust Co.*, 883 S.W.2d 648, 649 (Tex.1994).

**5.** We do not believe this disposition is in conflict with the Supremacy Clause of the United States Constitution. *See* U.S. CONST. art. VI. We do not intend to void the bankruptcy court's sale of Billy's claims to Treacy. Rather, we merely hold that, as a matter of Texas law, Treacy does not have standing to either prosecute or dismiss Billy's claims. As DKW asserts, standing is a component of subject-matter jurisdiction. DKW has failed to cite, and we cannot find, any authority standing for the proposition that a federal bankruptcy court can expand or contract the subject-matter jurisdiction of a state court by entering an order purportedly conferring standing on a party to prosecute or dismiss a claim in state court.

We also note that we do not determine the status of Billy's claims after remand. The issue of who, if anyone, has standing to dismiss or prosecute those claims must by litigated in the trial court below on remand.

## B) The Grounds For Directed Verdict

DKW's motion asserted the following grounds for directed verdict: [6]

(1) Gertrude had failed to prove economic damages because any damages she claimed resulted from DKW's malpractice arose from claims that would be categorized either as Billy's sole management community property or as joint management community property. As such, these claims became part of Billy's bankruptcy estate. Therefore, Gertrude had no individual interest to pursue.

(2) Gertrude failed to produce any evidence from which a jury could segregate her damages from Billy's.

(3) Gertrude failed to produce any evidence of the heightened culpability necessary for recovery of mental anguish damages. Also, since her claims for mental anguish were derivative of her claims for economic damages, they too are barred by the effects of Billy's bankruptcy.

(4) Gertrude failed to produce any evidence of causation or foreseeability.

(5) Gertrude failed to produce any evidence of "producing causation."

(6) Gertrude failed to produce any evidence of misrepresentations as required by the "laundry list" provisions of the DTPA.

(7) Gertrude failed to produce any evidence that DKW breached a duty to her.

## C) Analysis

The trial court granted DKW's Motion for Directed Verdict "on all grounds." Therefore, we must review each ground.

### 1) The Effect of Billy's Bankruptcy on Gertrude's Claims

In its brief, as in its motion for directed verdict, DKW argues that Gertrude's interest in her malpractice claim was community property. As such, DKW argues, Gertrude's claim became part of Billy's bankruptcy es-

tate pursuant to section 541 of the Bankruptcy Code. DKW seems to argue that Gertrude does not have standing to pursue her claims because she no longer owns them. Billy and Gertrude respond that Gertrude's claims were sole-management community property and did not become part of Billy's bankruptcy estate.

■ The starting point in our analysis is to classify the "property" in question. DKW argues that the "property" in question is joint-management community property because Gertrude's claims for damages arose out of joint community holdings, the Nu–Way companies. We agree with DKW that Gertrude's claim is community property because she acquired it during her marriage to Billy and it was not acquired by gift, devise, or descent nor was it a recovery for personal injuries. *See* Tex. Fam.Code Ann. § 5.01 (Vernon 1993). But, we also agree with Billy and Gertrude that the "property" in question is the *claim itself*, which is Gertrude's *sole-management* community property.

■ Sole-management community property is property over which one spouse has "sole management, control, and disposition." Tex. Fam.Code Ann. § 5.22(a) (Vernon 1993). Sole-management community property is property that the managing spouse:

would have owned if single, including *but not limited to:*

(1) personal earnings;

(2) revenue from separate property;

(3) recoveries for personal injuries, and

(4) the increase and mutations of, and the revenue from, all property subject to his or her sole management, control, and disposition.

*Id.* (emphasis added). It is important to note that while Gertrude's claim does not fit into any of the specifically enumerated categories of sole-management community property, the code specifically states that sole-management

---

**6.** DKW's motion and supplemental motion also presented claims that Gertrude had failed to present evidence that DKW committed "knowing" violations of the DTPA's unconscionability provisions and that Gertrude had failed to plead a requisite statutory violation to sustain her claim of negligence *per se*. During argument on

the motion for directed verdict, Gertrude nonsuited the negligence *per se* claim and the knowing violation of the DTPA claim. Because Gertrude voluntarily withdrew those two claims, we need not address them in our review of the directed verdict.

community property is not limited to those categories. *Id.*

Gertrude and Billy's petition indicated that she was filing suit against DKW in her individual capacity. Even if she had so desired, Gertrude could not have assigned her claim to Billy or the joint-management community estate. *See Zuniga*, 878 S.W.2d at 318. Because she could not assign the claim, Gertrude, by definition, had the "sole management, control, and disposition" of the claim. *See* TEX. FAM.CODE ANN. § 5.22(a) (Vernon 1993).

■■■ As DKW concedes in its brief, the non-debtor spouse's sole-management community property is not included in the debtor-spouse's bankruptcy estate under section 541(a). *In re Reiter*, 126 B.R. 961, 965 n. 3 (Bankr.W.D.Tex.1991). Thus, because Gertrude's claim was her sole-management community property, it did not become part of Billy's bankruptcy estate.

We also note that the liquidating trustee's presale memo indicated that Gertrude's claim was not part of Billy's bankruptcy estate. As such, it appears that even the trustee in bankruptcy did not believe that Gertrude's claim was part of the bankruptcy estate.

Accordingly, we hold that the trial court erred in granting DKW's motion for directed verdict on the grounds that Gertrude had no individual interest to pursue because of Billy's bankruptcy.

### 2) Segregation of Damages

■■■ DKW argues that Gertrude failed to present evidence of any damages she sustained that would be her sole-management community property. This argument hinges on DKW's contention that Gertrude's claims arose out of joint-management community assets, i.e., the loss of the Nu–Way Companies. We disagree because, as we have held above, Gertrude's claim itself was sole-management community property. As such, any recovery from her malpractice claims would be sole-management community property because it would constitute "revenue from" her sole-management community property. *See* TEX. FAM.CODE ANN. § 5.22(a)(4) (Vernon 1993). Consequently, Dr. Berry's testimony

concerning the amount of Gertrude's damages was sufficient to raise an issue of material fact as to her damages. Therefore, we hold that the trial court erred in granting DKW's motion for directed verdict on the grounds that Gertrude had failed to present evidence of her individual damages.

### 3) Mental Anguish Damages

DKW argues that directed verdict was proper with regard to Gertrude's claim for mental anguish damages on two grounds. First, DKW contends the claims for mental anguish are derivative of her claims for economic loss and are barred by the effects of Billy's bankruptcy. However, as we have held above, Gertrude did present evidence that raised an issue of material fact with regard to her individual damages and those damages are not barred by the effects of Billy's bankruptcy.

Second, DKW argues that mental anguish damages should not be recoverable in legal malpractice actions or, in the alternative, that Gertrude is not entitled to mental anguish damages in this case because she failed to prove "extraordinary or egregious circumstances" as is required to recover mental anguish damages.

As DKW concedes in its brief, there is no Texas case authority standing for the proposition that mental anguish damages are *never* recoverable in legal malpractice actions. However, DKW does point us to authority from other jurisdictions. *See Boros v. Baxley*, 621 So.2d 240 (Ala.), *cert. denied*, 510 U.S. 997, 114 S.Ct. 563, 126 L.Ed.2d 463 (1993) (holding that client may not recover mental anguish damages where legal malpractice involves no affirmative wrongdoing but merely neglect of duty); *Sanders v. Rosen*, 159 Misc.2d 563, 605 N.Y.S.2d 805 (N.Y.Sup.Ct.1993) (holding that damages for mental anguish are not recoverable in legal malpractice action). The Texas Supreme Court has upheld an award of mental anguish damages in a legal malpractice claim. *Cosgrove v. Grimes*, 774 S.W.2d 662, 665–66 (Tex.1989). In the absence of contrary authority from the Texas Supreme Court, we decline DKW's invitation to adopt such a rule.

On the other hand, we agree with DKW that a client must show "egregious or extraordinary" circumstances to recover mental anguish damages in a legal malpractice action. *See Rhodes v. Batilla,* 848 S.W.2d 833, 844–45 (Tex.App.—Houston [14th Dist.] 1993, writ denied); *Heath v. Herron,* 732 S.W.2d 748, 753 (Tex.App.—Houston [14th Dist.] 1987, writ denied).

At trial, Gertrude testified that starting just after the hearing that resulted in the CSA, she has suffered numerous physical ailments as well as severe depression for which her doctor advised her to take Prozac. She had never suffered any of these symptoms before that hearing. Martindale testified that Billy and Gertrude "gave away the store" under the CSA and that DKW did not act as reasonably prudent attorneys. Viewing this evidence in the light most favorable to Gertrude, we hold that it was sufficient to raise an issue of material fact for the jury as to whether "egregious or extraordinary" circumstances were present. As such, we hold that the trial court erred in granting DKW's motion for directed verdict with regard to Gertrude's claim for mental anguish damages.

### 4) Legal Causation: Foreseeability and Cause in Fact

DKW argues that directed verdict was proper because Gertrude failed to present competent evidence of proximate causation. This argument is based on DKW's assertion that expert testimony is required to prove causation in legal malpractice claims and neither Martindale nor Berry testified about causation.

Legal malpractice actions in Texas are based on negligence. *Cosgrove,* 774 S.W.2d at 664. Therefore, to prevail on her claim, Gertrude would have to prove that DKW's breach of the standard of care proximately caused her damages. *Id.* at 665. The two elements of proximate cause are cause in fact and foreseeability. *Nixon v. Mr. Property Management Co., Inc.,* 690

S.W.2d 546, 549 (Tex.1985). The determination of proximate cause in legal malpractice cases is usually a question of fact for the jury. *Millhouse v. Wiesenthal,* 775 S.W.2d 626, 627 (Tex.1989);[7] *Rhodes,* 848 S.W.2d at 841.

DKW urges us to adopt a rule that would require expert testimony regarding proximate cause in all legal malpractice cases. In support of this proposition, they cite one court of appeals opinion. *See Onwuteaka v. Gill,* 908 S.W.2d 276, 281 (Tex.App.—Houston [1st Dist.] 1995, no writ) (holding that breach of the standard of care and proximate cause must be proven by expert testimony in legal malpractice cases). While we agree that expert testimony on proximate cause may be required to prove some legal malpractice claims, we refuse to hold that it is required to prove all such claims.

Instead, we believe the proper rule is one that would only require expert testimony on proximate cause in cases where determination of that issue is not one that lay people would ordinarily be competent to make. Indeed, cases cited by DKW establish this rule. *See, e.g., 2175 Lemoine Ave. Corp. v. Finco, Inc.,* 272 N.J.Super. 478, 640 A.2d 346, 353 (App.Div.1994) ("Expert testimony may not be appropriate or necessary ... in every legal malpractice case, particularly where the causal relationship between the attorney's legal malpractice and the client's loss is so obvious that the trier of fact can resolve the issue as a matter of common knowledge."); *Meyer v. Mulligan,* 889 P.2d 509, 516 (Wyo.1995) (expert testimony required where proximate cause "not a question that lay people could competently determine.").

In the case at bar, we believe that Billy, as a lay person, was qualified to testify that the advice he received from DKW resulted in Gertrude and him losing their interest in Nu–Way and in his bankruptcy filing. Billy testified that he only sent the notice of the shareholder's meeting because DKW ad-

---

**7.** We realize that *Millhouse* specifically held that determination of proximate cause in *appellate* legal malpractice cases is a question of law. *Millhouse,* 775 S.W.2d at 628. But, the court also stated that determination of proximate cause in legal malpractice cases is *usually* a question of fact. *Id.* at 627.

vised him to do so. He also testified that DKW advised Gertrude and him to sign the CSA. Further, he testified that after the CSA, Nu–Way's board was hopelessly deadlocked because the CSA required Gertrude to resign her directorship. As such, he was unable to force Nu–Way to pay its debt to Sunbelt Savings. This directly resulted in the $1.2 million dollar judgment that forced Billy into bankruptcy. Billy's testimony coupled with Martindale's testimony that the CSA did not adequately protect Billy and Gertrude's interests because it did not give them a means to adequately enforce their rights and that DKW could have negotiated to add certain provisions that would have protected their interests, was enough evidence to raise an issue of material fact for the jury with regard to proximate cause. Accordingly, viewing the evidence in the light most favorable to Gertrude, we hold that the trial court erred in granting DKW's motion for directed verdict on the ground that Gertrude failed to produce any probative evidence of proximate cause.

### 5) DTPA "Laundry List" Provisions

DKW argues that directed verdict was proper with regard to Gertrude's DTPA claim because she failed to offer evidence of misrepresentation as is required by the "laundry list" provisions of the DTPA. Gertrude's last live pleading [8] alleged the three following "laundry list" violations:

> (5) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have....
>
> . . . .
>
> (7) representing that goods or services are of a particular standard, quality, or grade....
>
> . . . .
>
> (12) representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve....

---

8. In their brief, Billy and Gertrude also allege violations of section 17.46(b)(23) (failing to disclose information with intent to induce the consumer into a transaction). But, this section was

TEX. BUS. & COM.CODE ANN. § 17.46(b)(5), (7), (12) (Vernon Supp.1997).

Gertrude and Billy both testified that DKW advised them to sign the CSA. A reasonable jury could infer that DKW had represented to them that the CSA protected their interests. Martindale testified that the CSA did not protect their interests. Viewed in the light most favorable to Gertrude, this evidence was sufficient to raise an issue of material fact for the jury as to whether DKW represented that the CSA (and by extension, their advice to sign the CSA) had "characteristics" or "benefits" that it did not have and that "an agreement confers or involves rights, remedies, or obligations which it does not have or involve." However, we agree with DKW that Gertrude failed to produce any evidence that DKW represented its legal services were of a "particular standard, quality, or grade."

Accordingly, we hold that the trial court erred in granting DKW's motion for directed verdict with regard to Gertrude's section 17.46(b)(5) and section 17.46(b)(12) claims. We hold that the trial court did not err, however, in granting DKW's motion for directed verdict with regard to Gertrude's section 17.46(b)(7) claim.

### 6) Breach of Duty

DKW argues that directed verdict was proper because Gertrude's expert witness, Martindale, testified that DKW did not comply with the following standard of care: actions "which an ordinarily prudent Texas attorney *would or would not* have done under the same or similar circumstances." DKW argues that the proper standard of care is whether the attorney's decision was one that "a reasonably prudent attorney *could* make in the same or similar circumstances."

DKW's argument is based on the statement in *Cosgrove* that "[i]f an attorney makes a decision which a reasonably prudent attorney *could* make in the same or similar circumstance, it is not an act of negligence."

not specifically pleaded and there is nothing in the record indicating the issue was tried by consent. As such, we need not address this claim.

*Cosgrove,* 774 S.W.2d at 665. But, in *Cosgrove,* the Court also stated that "[a] lawyer in Texas is held to the standard of care which *would* be exercised by a reasonably prudent attorney." *Id.* at 664; *see also Hall v. Stephenson,* 919 S.W.2d 454, 465 (Tex.App.—Fort Worth 1996, writ denied) (attorney held to standard of care which *would* be exercised by reasonably prudent attorney). The Court did not explain the difference, if any, between the "would" and "could" standards.

Regardless of the distinction between "could" and "would," viewing Martindale's testimony in the light most favorable to Gertrude, we hold that a rational jury could infer that DKW's actions were not those that a reasonably prudent attorney could or would make. Accordingly, we hold that the trial court erred in granting DKW's motion for directed verdict on the grounds that Gertrude failed to produce any evidence of breach of duty.

**D) CONCLUSION**

We hold that the trial court did not err in granting DKW's motion for directed verdict with regard to Gertrude's section 17.46(b)(7) DTPA claim. Therefore, we affirm the trial court's judgment as to that claim. However, having found that the trial court erred in granting DKW's motion for directed verdict on all other grounds asserted in the motion and supplemental motion, we reverse as to Gertrude's other claims. Accordingly, Billy and Gertrude's first point of error is sustained in part and overruled in part.

**CONCLUSION**

Because we sustain Billy and Gertrude's second point of error and sustain in part and overrule in part their first point of error, we reverse and remand this case to the trial court for further proceedings consistent with this opinion.