# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-12-00005-CV

**LeAnn Randall, Appellant**

**v.**

**Goodall & Davison, P.C. and J. Mark Avery, Appellees**

### FROM THE COUNTY COURT AT LAW NO. 4 OF WILLIAMSON COUNTY
### NO. 09-0430-CP4-C, HONORABLE JOHN MCMASTER, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

This appeal concerns litigation that arose after a widowed wife, appellant LeAnn Randall, discovered that her late husband, Dr. Bob Randall, had left her less of an inheritance than she claims he promised her. Alleging that she had been tortiously deprived of her interest in community property that Bob had transferred to an irrevocable trust benefitting his children from a prior marriage, LeAnn sued not only Bob's estate but several individuals and entities who had provided estate-planning services to the couple or Bob prior to Bob's death.[1] The defendants included an attorney—appellee J. Mark Avery—and Avery's law firm at the time—appellee Goodall & Davison, P.C.—from whom she sought recovery of damages under theories of professional negligence and breach of fiduciary duties.

---

[1] Because the couple shared a common surname, we refer to them by their first names for clarity.

Avery and Goodall & Davison each moved for summary judgment asserting limitations and no evidence of causation. Subsequently, after LeAnn filed a response to their motions, appellees each moved to strike expert affidavit testimony on which she relied for proof of causation. The trial court struck the material part of the expert's affidavit and then granted appellees' summary-judgment motions without stating the grounds on which it relied.

Following a severance that made these rulings final, LeAnn brought this appeal, challenging the trial court's evidentiary ruling and each of the grounds on which it could have relied in rendering summary judgment. We will affirm the judgment in part, reverse in part, and remand.

## BACKGROUND

The underlying events center on a succession of family tragedies—a spouse's terminal illness, the marital difficulties that can arise amid such trauma, and litigation between family members.[2] LeAnn, a master's-degreed dietician who then worked at the Scott & White Clinic, and Bob, a doctor there, were married in July 2004. While this was LeAnn's first marriage, Bob was a widower—his first wife had died of cancer about six months before Bob began dating LeAnn—and he had two teenaged children from his prior marriage.

In mid-2005, Bob was diagnosed with cancer. Despite surgery and chemotherapy, Bob's cancer eventually spread and worsened to the extent that, in September 2006, the couple began meeting with a financial planner, Sarah Buenger of Briand Financial Services, Inc., to discuss estate planning in anticipation of Bob's eventual death from the disease. Subsequently, Avery, an attorney

---

[2] We take the foregoing facts from the summary-judgment record, viewed in the light most favorable to the non-movant, LeAnn. *See Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005).

2

at Goodall & Davison, was hired to provide legal services in connection with the estate planning. An engagement letter, subsequent billing statements, and other correspondence reflected that, at least in the inception of the relationship, Avery was providing legal services jointly to Bob and LeAnn.

Bob and LeAnn, along with Buenger, met with Avery in person on October 27, 2006. At this juncture, Bob and LeAnn shared the overarching objective that the combined value of their two estates would be divided in three roughly equal shares among Bob's two children and LeAnn following Bob's death. The value of the couple's combined estate was approximately between $4 and $5 million, and consisted chiefly of investment and retirement accounts in Bob's name and life insurance, assets that would pass by beneficiary designation rather than by will. During their October 27 meeting and at various times afterward, Avery advised the couple (although communicating chiefly with Bob and Buenger rather than LeAnn) regarding strategies for achieving the intended three-way division while minimizing tax liability. A further objective was to remedy perceived past errors in the administration of an irrevocable life insurance trust (ILIT) that Bob and his first wife had established in 1999 for the benefit of their two children. An ILIT, simply described, provides a potential means of avoiding estate taxes by transferring ownership of a life insurance policy to the trust so the policy proceeds are not included in the decedent's estate.

As one component of the strategies or plan, Avery drafted a will for Bob that divided his personal and household effects to LeAnn and Bob's children in three equal shares and directed the executor to divide the residue among the three in a manner that, to the extent reasonably possible, would achieve an equal three-way division of the total value of the couple's combined estates, counting not only the assets passing through the will itself but also any non-probate assets and any community property. Bob also named LeAnn as the sole primary beneficiary of certain non-probate

3

assets he held, including a Scott & White retirement plan and a Scott & White 403(b) savings plan. Conversely, Avery, as well as Buenger and other Briand employees, advised or assisted the couple in transferring a $1.75 million term life insurance policy on Bob's life—formerly a community asset, with LeAnn named as the sole primary beneficiary—out of the couple's estates to the ILIT benefitting Bob's children, and changing the policy's beneficiary to the ILIT's trustee. To facilitate the transfer, Avery prepared a form "Partition Agreement (Life Insurance)" for Bob and LeAnn to execute in agreement that the life insurance policy was Bob's separate property. Avery similarly prepared a form "Partition Agreement (Cash)" for the couple to execute in the event Bob gifted funds originating in a community account to the trust.

On February 13, 2007, Bob and LeAnn returned to Avery's office to sign several documents Avery had prepared for them. Bob signed his will, and he and LeAnn executed the form "Partition Agreement (Life Insurance)," agreeing that the $1.75 million life insurance policy was Bob's separate property. With Buenger's assistance, the policy beneficiary was changed to the ILIT and policy ownership was likewise transferred to the trust. A few weeks thereafter, on March 1, 2007, LeAnn and Bob utilized the "Partition Agreement (Cash)" form in agreeing that $26,400 in a Bank of America account was Bob's separate property. This amount was ultimately transferred to the ILIT trustee, evidently in anticipation that a portion would be used to pay annual premiums on the $1.75 million life insurance policy.

In the meantime, according to LeAnn, the couple had been experiencing marital difficulties centering, at least in part, on religious differences.[3] Their difficulties were intensified

_____

[3] LeAnn averred that Bob was Mormon, while she came from a Catholic background. Although she had converted to Mormonism prior to the couple's marriage, LeAnn testified that she

4

by the stress of Bob's illness and the family's move to a new home, and worsened to the point that, in September 2007, LeAnn moved out of the family's new home and began living with her parents. The couple reconciled to the extent that, in October 2007, LeAnn moved back into the home. Not long thereafter, according to LeAnn, Bob presented her with a copy of a divorce petition that he claimed to have filed against her. However, while the couple would temporarily separate once more during the spring of 2008, they ultimately did not divorce.

LeAnn would later insist that she remained with Bob despite the couple's problems, caring for Bob and helping with such tasks as driving him to his doctor's appointments, out of love and in the belief that Bob likewise loved her, was committed to their marriage, and would be leaving her the promised one-third share of the couple's total wealth after he died. In fact, as early as May 2007, as the couple's marital relationship continued to deteriorate, Bob had contacted Avery and begun discussing changes to his estate plan to reduce the share LeAnn received. Ultimately, around the time of the couple's first separation, Bob directed Avery to draft a revised will that left LeAnn nothing. Avery did so, and Bob signed the new will on September 28, 2007. Neither Bob nor Avery advised LeAnn that Bob was seeking to depart from the couple's original estate plan or had revised his will.

Additionally, with some guidance from Avery and Buenger, Bob changed the designations of beneficiary on various of his retirement and investment accounts to substitute his children's ILIT as sole primary beneficiary in lieu of LeAnn. At least in some instances, Bob

_____

began to have deepening "doubts" about Mormon teachings and ultimately refused, during the fall of 2006, and to Bob's great displeasure, to be "sealed" in marriage with him. There was also evidence that the couple's conflicts became increasingly problematic after Bob discovered that LeAnn had been surreptitiously attending Catholic mass.

obtained the consent of LeAnn to make the change—notwithstanding their ongoing marital difficulties.[4] Similarly, in April 2008, at or around the time of the couple's second separation, Bob obtained LeAnn's signature on a second cash partition agreement similar to the first, agreeing that an additional amount of $26,400 in a Bank of America account was Bob's separate property.

LeAnn would later claim that she had signed these documents and the earlier partition agreements without reading them, and that she had little understanding of the relevant financial concepts or "legal jargon" in any event. She insisted that she had simply signed whatever Bob had asked her to sign in relation to estate-planning matters because she "trusted [her] husband" and understood that she was merely continuing to effectuate the couple's original plan under which she would receive a one-third share of the total wealth.

Bob died on July 7, 2009. Approximately a week after the funeral service, LeAnn discovered Bob's revised will and that it devised no property to her. Around the same time, LeAnn claimed, she learned that while Bob had left her an Allianz annuity, she was no longer a beneficiary of the $1.75 million life insurance policy or Bob's Scott & White retirement benefits.

On July 6, 2010—about a year after Bob's death and her discovery of its economic implications for her—LeAnn filed suit against the executor of Bob's estate; Avery and Goodall & Davison; and the trustees of the ILIT and two additional trusts through which Bob's children were to inherit under his will. Through subsequent amendments, LeAnn also joined Buenger and Briand as defendants. In her live pleadings,[5] LeAnn complained that her late husband, assisted by

---

[4] For example, LeAnn's notarized signature, dated October 8, 2007, appears on forms changing the beneficiary of Bob's Scott & White retirement plan and 403(b) savings plan.

[5] Her fifth amended petition.

6

Avery, Goodall & Davison, Buenger, and Briand, had acted tortiously in causing the loss of her interest in community property that Bob transferred to the irrevocable trust that benefitted Bob's children—specifically, the $1.75 million life insurance policy, the two $26,400 cash payments, and Bob's retirement accounts, which she asserted to be community property. She sought damages from each of these defendants in "an amount not to exceed $1,572,339.70," which she asserted was the value of the share in community property that she had lost.[6]

With respect to the appellees in this case, LeAnn alleged that Avery (and, through respondeat superior, Goodall & Davison) were liable to her for negligence in preparing and advising her to sign the partition agreements as a means of accomplishing their intended three-way division of value instead of devising some "alternative planning idea that would not have caused [LeAnn] to give up her community property rights."[7] LeAnn further pled that Avery (and Goodall & Davison) had breached "fiduciary duties" in failing to advise LeAnn to secure separate counsel who would more aggressively advocate her interests, in preparing Bob's revised will and failing to inform LeAnn of it, and in "failing to inform" LeAnn that she was "irrevocably giving up rights to [Bob's] retirement plans" by consenting to changes in beneficiaries and their impact. LeAnn additionally

---

[6] Thus, as she emphasizes on appeal, LeAnn has not sought to recover the value of the inheritance that Bob allegedly promised her, per se, but instead the value of her interest in community property that she claims to have lost through the defendants' wrongful actions.

In addition to seeking these damages from Bob's estate, appellees, Buenger, and Briand, LeAnn also sought punitive damages from Bob's estate and a constructive trust on the estate and the children's trusts.

[7] LeAnn does not purport to assert any direct theory of liability against Goodall & Davison, only respondeat superior based on Avery's alleged acts or omissions.

invoked the discovery rule, pleading that she had not known and had no reason to know of Avery's alleged breaches until her discovery of the true amount of her inheritance in July 2009.

Avery and Goodall & Davison each filed summary-judgment motions that combined a no-evidence ground challenging the causation elements of LeAnn's claims and a traditional ground purporting to establish that LeAnn's negligence claims were barred by the two-year statute of limitations. Additionally, Avery, but not Goodall & Davison, asserted a no-evidence ground asserting that any evidence LeAnn might adduce in support of her claims would sound in negligence rather than breach of fiduciary duty, revealing her "breach-of-fiduciary-duty" claims to be merely improperly "fractured" negligence claims.[8]

LeAnn filed essentially identical responses to the two summary-judgment motions, attaching evidence that included affidavits from herself and an expert, estate planning attorney Michael J. Cenatiempo, who purported to give opinions in support of her liability theories. Both Avery and Goodall & Davison filed objections to Cenatiempo's affidavit, each asserting, in material part, that his testimony regarding causation was "conclusory" (i.e., lacking an adequate underlying basis) and, thus, inadmissible and incompetent.

Following a hearing, the trial court sustained appellees' material objections to Cenatiempo's testimony and excluded the challenged testimony. The court then granted both of their summary-judgment motions without stating the specific grounds on which it relied. On the agreed

---

[8] Goodall & Davison also asserted a no-evidence ground challenging the duty element of a negligence theory that LeAnn had pled as of the time of the motion, but subsequently non-suited by omission from her subsequent amended pleadings. LeAnn and Goodall & Davison agree that this negligence theory and corresponding summary-judgment ground were not addressed in the trial court's judgment and are not at issue on appeal.

motions of Avery and Goodall & Davison, the trial court severed LeAnn's claims against them into a separate suit, making the court's rulings final. This appeal followed.

## ANALYSIS

With new counsel on appeal, LeAnn challenges the trial court's judgment in five issues.[9] In her first two issues, LeAnn argues that the trial court erred to the extent it granted summary judgment based on the two-year statute of limitations applicable to negligence claims. In her third issue, urged in the event we reject her first two, LeAnn challenges Avery's "fracturing" ground, arguing that the trial court erred to the extent it granted Avery's summary-judgment motion on the basis that its breach-of-fiduciary-duty claims all sound only in negligence and are thus subject to the two-year rather than four-year limitations period.

LeAnn's remaining issues address appellees' no-evidence summary-judgment grounds challenging her proof of causation. In her fourth issue, LeAnn urges that even if Cenatiempo's expert testimony is excluded, she presented evidence of causation sufficient to overcome summary judgment and that expert testimony was neither required nor necessary to meet her burden. In her fifth and final issue, LeAnn argues that the trial court abused its discretion in excluding Cenatiempo's testimony.

**Standard of review**

We review the trial court's summary judgment rulings de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005); *Provident Life & Accident Ins. Co. v. Knott*,

---

[9] In what she styles as a sixth issue, LeAnn merely emphasizes that she non-suited the negligence theory that was the subject of Goodall & Davison's no-duty ground and that this issue is not before us. *See supra* note 8.

128 S.W.3d 211, 215 (Tex. 2003). Summary judgment is proper when there are no disputed issues of material fact and the movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Knott*, 128 S.W.3d at 215-16. When reviewing a summary judgment, we take as true all evidence favorable to the non-movant, and we indulge every reasonable inference and resolve any doubt in the non-movant's favor. *Valence Operating Co.*, 164 S.W.3d at 661; *Knott*, 128 S.W.3d at 215. Where, as here, the trial court does not specify its basis for granting summary judgment, the judgment must be affirmed if any of the grounds asserted in the motion has merit. *See Star-Telegram, Inc. v. Doe*, 915 S.W.2d 471, 473 (Tex. 1995).

As previously indicated, appellees relied on both "traditional" and no-evidence grounds for summary judgment. Under the traditional summary-judgment standard, the movant has the initial burden of conclusively negating at least one essential element of a claim or defense on which the non-movant has the burden of proof or conclusively establishing each element of a claim or defense on which the movants have the burden of proof. *See* Tex. R. Civ. P. 166a(c); *Science Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex. 1997). Once the movant has done so, and only if it does, the burden shifts to the non-movant to produce evidence creating a genuine issue of material fact as to the challenged element or elements in order to defeat the summary judgment. *See Walker v. Harris*, 924 S.W.2d 375, 377 (Tex. 1996).

Under the no-evidence summary-judgment standard, by contrast, a movant may challenge whether there is legally sufficient evidence of one or more essential elements of a claim or defense on which the adverse party would have the burden of proof at trial. Tex. R. Civ. P. 166a(i); *see Fort Worth Osteopathic Hosp., Inc. v. Reese*, 148 S.W.3d 94, 99 (Tex. 2004). In response, the non-movant has the burden of presenting summary-judgment evidence raising a genuine issue

10

of material fact as to the challenged element or elements. Tex. R. Civ. P. 166a(i); *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004). A no-evidence summary judgment will be sustained when: (1) there is a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla; or (4) the evidence conclusively establishes the opposite of a vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005); *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003). More than a scintilla of supporting evidence exists if the evidence would allow reasonable and fair-minded people to differ in their conclusions. *King Ranch*, 118 S.W.3d at 751. "Less than a scintilla of evidence exists when the evidence is 'so weak as to do no more than create a mere surmise or suspicion' of a fact." *Id*. (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)).

**Causation**

Appellees' summary-judgment motions each asserted no-evidence grounds challenging the causation element of LeAnn's claims against them, specifically whether there is evidence of causation in fact. To overcome these grounds, LeAnn had the burden to present legally sufficient evidence that an alleged act or omission by Avery that is a basis for her claims was, in reasonable probability, a "substantial factor" in causing her injury—the loss of her community-property interests in the $1.75 million life insurance policy, the two $26,400 payments, and Bob's retirement benefits—and that "but for" such act or omission, LeAnn would not have been harmed. *See, e.g.*, *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 45–46 (Tex. 2007). And it is not enough for

11

LeAnn to show merely that Avery's actions furnished the condition that made her injury possible. *See IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 799 (Tex. 2003).

Because the ramifications of a particular act or omission by a lawyer are frequently beyond the common understanding of lay jurors, proof of the requisite causal linkage to injury often requires expert testimony. *See Alexander v. Turtur & Assocs., Inc.*, 146 S.W.3d 113, 119–20 (Tex. 2004). For example, expert testimony is held to be necessary to establish a causal link between a lawyer's acts or omissions in the preparation or prosecution of a lawsuit and an adverse ultimate outcome in the suit—the so-called "case within a case"—because answering that question requires specialized knowledge of a tribunal's likely actions in light of the governing law and procedural rules. *See, e.g.*, *id.*; *Cantu v. Horany*, 195 S.W.3d 867, 873–74 (Tex. App.—Dallas 2006, no pet.). However, expert testimony on causation may not be required when "the clients themselves," as opposed to a tribunal or other third party, "were the key decisionmakers, relying upon their attorney's advice with unfortunate consequences." *Alexander*, 146 S.W.3d at 119. For example, in certain cases where a former client has sought damages arising from his entry into an injurious transaction in reliance on a lawyer's allegedly deficient advice, the former client has been deemed competent to testify as to his reliance on the advice and the adverse effects of the transaction. *See Delp v. Douglas*, 948 S.W.2d 483, 495–96 (Tex. App.—Fort Worth 1997), *rev'd on other grounds*, 987 S.W.2d 879 (Tex. 1999); *Connolly v. Smith*, No. 03-03-00575-CV, 2004 WL 1898220, at \*5–6 (Tex. App.—Austin Aug. 26, 2004, pet. denied) (mem. op.).

On appeal, LeAnn argues that she presented evidence of three ways in which Avery's alleged acts or omissions were the cause in fact of her losing her community-property interests in these assets. Relatedly, in her fourth issue, she contends that these causal linkages are within the

12

common understanding of lay jurors, such that she was not required to present expert testimony to explain them. Nor, LeAnn insists, did she need such testimony because she had "abundant" evidence of causation in the form of lay testimony, including her own affidavit, and documentary evidence. In the alternative, in her fifth issue, LeAnn asserts that the trial court abused its discretion in excluding Cenatiempo's expert opinions on causation.

The first of the three causal linkages, LeAnn asserts, is evidence that Avery's "breach of fiduciary duty" in helping Bob revise his will to exclude her caused her to lose the value she was to receive under the original estate plan in exchange for having signed away her community-property interests in the $1.75 million life-insurance policy and two $26,400 payments. In essence, LeAnn urges that Avery is the but-for cause of the financial impact of Bob's revised will on her because the lawyer did not simply decline the representation.

The chief impediment to this theory of causation, as appellees correctly observe, is that Bob had the absolute right to change his will as he saw fit, whether the changes were drafted by Avery or someone else, and regardless of any contrary wishes of LeAnn or anyone else. *See* Tex. Prob. Code §§ 57, 58 ("Every person competent to make a last will and testament may thereby devise and bequeath all the estate, right, title, and interest in property the person has at the time of the person's death, subject to the limitations prescribed by law."); *Pool v. Diana*, No. 03-08-00363-CV, 2010 WL 1170234, at *7 (Tex. App.—Austin Mar. 24, 2010, pet. denied) (mem. op.) (noting that testator can "dispose of his property in any manner he chooses" (citing *In re Estate of Morris*, 577 S.W.2d 748, 755 (Tex. Civ. App.—Amarillo 1979, writ ref'd n.r.e.) ("Neither courts, juries, relatives nor friends of a testator may say how property should be passed by a will or rewrite a will because they do not like the distribution of the property."))). In light of that principle, the effect of

13

any alternative conduct by Avery, and more particularly whether it would have ultimately prevented Bob from executing a will excluding LeAnn, would turn on a succession of contingencies that the summary-judgment evidence does not come close to addressing. LeAnn did not address these contingencies in her affidavit and, in fact, she acknowledged during her deposition that "honestly, I don't know" when asked whether her financial situation would have been any different had Bob hired a lawyer other than Avery to revise his will. As for Cenatiempo, to the extent his testimony is considered, he seems to complain only that Avery's assistance in drafting the revised will led ultimately to its admission to probate, but never attempts to explain why or how Avery would have prevented that outcome by declining the representation. In short, LeAnn presents no more than "mere conjecture, guess, or speculation" that Bob would not have executed a will excluding LeAnn if only Avery had declined to assist him. *See Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 246 (Tex. 2008) (noting that "proximate cause cannot be satisfied by mere conjecture, guess, or speculation"); *see also City of Keller*, 168 S.W.3d at 813–14 (discussing the equal-inference rule).[10]

The second causal linkage, according to LeAnn, is evidence that Avery's "breach of fiduciary duties" in failing to disclose to her his "conflict of interest" and Bob's efforts to deny her anticipated inheritance caused her damages by preventing her from more vigorously protecting her rights. In other words, LeAnn argues that the summary-judgment evidence raises a fact issue as to whether (1) she would have taken alternative action in defense of her rights had Avery disclosed these matters to her; and (2) that action would have prevented her injury. But LeAnn's testimony

---

[10] The same analysis would apply to the extent LeAnn is similarly arguing that Avery caused her injury by advising or assisting Bob in changing the beneficiaries on his retirement accounts.

regarding what she would have done differently with the additional information is limited to the following statement:

> Had I known the extent of [Bob's] actions to deprive me not only of the one-third of the estate he had promised I would have received at his death but of my own property, I would have sought the advice and assistance of an attorney to represent me in the divorce Bob had filed.

LeAnn does not attempt to explain why or how litigating the divorce Bob filed during the fall of 2007 would have yielded a better financial outcome for her—and only an expert would have been qualified to do so. *See Alexander*, 146 S.W.3d at 120 (holding expert testimony necessary to establish causation in claim that attorney's negligence caused loss in underlying trial); *see also Finley v. Fargason*, No. 03-09-00685-CV, 2010 WL 4053711, at *3 (Tex. App.—Austin Oct. 15, 2010, no pet.) (mem. op.) (expert testimony necessary to establish appellant would have prevailed at trial in suit to modify parent-child relationship but for his attorney's alleged professional negligence). Yet Cenatiempo does not present any opinions regarding the outcome of divorce litigation if LeAnn had pursued it. Once again, LeAnn can offer no more than speculation and surmise of a causal linkage between her damages and Avery's alleged conduct.

The third and final causal linkage, LeAnn urges, is established by evidence that her losses of her community-property interests in the $1.75 million life insurance policy and two $26,400 cash payments were directly attributable to the very estate plan that Avery advised her and Bob to implement. LeAnn alleged that Avery breached the duty of care in devising an estate plan that required her to transfer these interests to Bob's sole control while securing her only an expectation of inheriting under Bob's will and beneficiary-designated retirement plans in return. LeAnn

15

insists that she presented summary-judgment evidence that she relied on this plan in executing the three partition agreements, and that the partition agreements in themselves were her injury. She adds that the nature of this causal connection was within the competence of lay jurors. *See Delp*, 948 S.W.2d at 495; *Connolly*, 2004 WL 1898220, at *5. We agree that LeAnn has, in these ways, raised a fact issue regarding her third theory of causation. Assuming that Avery acted negligently in devising an estate plan that entailed LeAnn's signing away of her interests in the $1.75 million life insurance policy and two $26,400 cash payments (which is undisputed for purposes of appellees' summary-judgment motions), LeAnn presented evidence—including her affidavit, her deposition and those of Avery and Buenger, and the documents reflecting the development and implementation of the estate plan—that she relied on Avery's advice in signing the partition agreements that effected her injury, and this evidence was competent to prove those facts. *See Delp*, 948 S.W.2d at 496; *Connolly*, 2004 WL 1898220, at *6.

In urging us instead to affirm summary judgment as to LeAnn's negligence claims, Avery argues that LeAnn failed to present any evidence that Avery, as opposed to Bob, had anything to do with her signing the three partition agreements. While there is some summary-judgment evidence that might support such an inference, at least with respect to the cash partition agreements, LeAnn testified that she signed each of these documents in reliance on the estate plan Avery advised her to pursue, and we must credit her testimony and draw reasonable inferences in her favor instead. *See Valence Operating Co.*, 164 S.W.3d at 661. Avery similarly insists that there is no evidence that the life insurance policy or subsequent cash payments were, in fact, community property, but the summary-judgment record included written or e-mail communications among Avery, Buenger, and the couple evidencing their recognition that both sets of assets were community assets.

16

Finally, Goodall & Davison insists that LeAnn failed to respond altogether to its no-evidence ground challenging the causation element of her negligence claim, effectively conceding that ground by default. The gravamen of Goodall & Davison's argument is that while LeAnn attached evidence relevant to causation to her summary-judgment response, she presented her arguments discussing that evidence within a section of her response that is preceded by a heading that references her "breach-of-fiduciary-duty" claims and not her negligence claim. We reject such a formalistic view of LeAnn's summary-judgment response and conclude that she responded to Goodall & Davison's no-evidence ground with respect to both her breach-of-fiduciary-duty claims and her negligence claims. *See Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 206–08 (Tex. 2002).

In sum, although the trial court properly granted summary judgment as to LeAnn's "breach-of-fiduciary-duty" claims based on appellees' no-evidence grounds challenging the causation element, it erred to the extent it relied on that ground in granting summary judgment as to LeAnn's negligence claims. To this extent, we sustain LeAnn's fourth issue.

**Limitations**

In addition to relying on their no-evidence grounds challenging the causation elements of each of LeAnn's claims, appellees both sought summary judgment on the ground that LeAnn's negligence claims are barred by the applicable two-year statute of limitations. *See* Tex. Civ. Prac. & Rem. Code § 16.003(a); *Apex Towing Co. v. Tolin*, 41 S.W.3d 118, 120 (Tex. 2001). As the movants seeking summary judgment on an affirmative defense, appellees bore the burden of conclusively establishing each of its elements, which meant that they had to conclusively establish

when LeAnn's negligence claims accrued and that this occurred more than two years before LeAnn filed suit in July 2010. *See Diversicare General Partner, Inc. v. Rubio*, 185 S.W.3d 842, 846 (Tex. 2005). A cause of action normally accrues when a defendant's alleged wrongdoing causes some legal injury. *See Via Net v. TIG Ins. Co.*, 211 S.W.3d 310, 313 (Tex. 2006) (per curiam). However, LeAnn pled the discovery rule, which, if applicable, would toll accrual until the point in time when she either knew or should have known the nature of her injury. *See Apex Towing Co.*, 41 S.W.3d at 121 (citing *Willis v. Maverick*, 760 S.W.2d 642, 646 (Tex. 1988)). Although appellees suggest otherwise, where, as here, a plaintiff pleads the discovery rule, the defendant bears the summary-judgment burden of negating its application. *See Via Net*, 211 S.W.3d at 313; *Burns v. Thomas*, 786 S.W.2d 266, 267 (Tex. 1990); *cf. In re Estate of Matejek*, 960 S.W.2d 650, 651 (Tex. 1997) (per curiam) (party seeking summary judgment on limitations not required to negate discovery rule when nonmovant has not pled or otherwise raised it). Assuming the discovery rule is properly applicable to the case, the movant must negate the existence of a genuine issue of material fact as to when the plaintiff discovered or should have discovered the nature of the injury. *See Burns*, 786 S.W.2d at 267.

In seeking summary judgment based on limitations, appellees relied solely on the assertion that LeAnn's negligence claims had accrued when she executed each of the three partition agreements that constituted her injury from Avery's alleged negligence—in February 2007, March 2007, and April 2008, respectively, each of which occurred more than two years before LeAnn filed suit in July 2010. But neither appellee mentioned the discovery rule in its summary-judgment motion or purported to present evidence that would negate its application. Emphasizing these omissions, LeAnn urges in her second issue that the district court erred in granting summary

18

judgment on limitations where she had properly raised the discovery rule but appellees' motions do not even mention it. Similarly, in her first issue, LeAnn asserts that appellees failed to negate the existence of fact issues regarding when she discovered or should have discovered the nature of her injuries.

In addition to erroneously suggesting that they did not bear the summary-judgment burden to negate the discovery rule, appellees contend that the discovery rule is inapplicable here because LeAnn's injuries were not inherently undiscoverable. They reason that LeAnn's injuries from Avery's alleged negligence in devising the estate plan were readily apparent from the face of the partition agreements themselves. However, "[t]his legal question is decided on a categorical rather than case-specific basis; the focus is on whether a *type* of injury rather than a *particular* injury was discoverable." *Via Net*, 211 S.W.3d at 314 (emphasis in original). And the Texas Supreme Court has long held that the discovery rule applies to claims for professional negligence by lawyers. *See Apex Towing Co.*, 41 S.W.3d at 120–21 (citing *Willis*, 760 S.W.2d at 646); *see also Connolly*, 2004 WL 1898220, at *2. The rationale for the discovery rule's application is "based in part on the special relationship between attorney and client and on the difficulty posed for a client in determining whether or when malpractice may have occurred." *Apex Towing Co.*, 41 S.W.3d at 121 (citing *Willis*, 760 S.W.2d at 645). Consequently, appellees bore the burden of negating the discovery rule by conclusively establishing that LeAnn discovered or should have discovered her injuries more than two years before she filed suit.

Although appellees urge that the summary-judgment evidence ultimately met this burden, we are compelled to agree with LeAnn that we must reverse because neither appellee presented a challenge to the discovery rule as a ground in the summary-judgment motion. *See*

19

Tex. R. Civ. P. 166a(c); *McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 341 (Tex. 1993). To this extent, we sustain LeAnn's second issue, and do not reach her first. We likewise need not reach LeAnn's third issue concerning Goodall & Davison's "fracturing" ground, which she presents in the alternative to her limitations issues, and that our holdings regarding causation have rendered moot in any event.

## CONCLUSION

We affirm the trial court's summary judgment as to all of LeAnn's claims except for her negligence claims—i.e., her claims predicated on Avery's alleged negligence in purportedly causing her to sign away her community interests in the $1.75 million life insurance policy and the two $26,400 cash payments—and remand them to the trial court for further proceedings.

_____

Bob Pemberton, Justice

Before Justices Puryear, Pemberton, and Field

Affirmed in part; Reversed and Remanded in part

Filed:   July 2, 2013

20